J-S12016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: E.E.S., A
MINOR

APPEAL OF: J.P., MOTHER

:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA


No. 105 EDA 2022

Appeal from the Decree Entered December 3, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000512-2021


BEFORE:  BENDER, P.J.E., BOWES, J., and DUBOW, J.

MEMORANDUM BY BOWES, J.:                           **FILED MAY 11, 2022**

J.P. ("Mother") appeals from the decree entered on December 3, 2021, that terminated her parental rights to her son, E.E.S.[1]  We affirm.

E.E.S. was born in October 2019, and he immediately came into the care of the Philadelphia Department of Human Services ("DHS") as a result of the child testing positive for PCP at birth.  N.T., 12/03/21, at 19.  DHS permitted the child to be discharged from the hospital with Mother and provided in-home services at Mother's residence with the paternal grandmother ("Grandmother"), an adoptive resource who provides kinship foster care.  **Id**. at 19-20.  However, the juvenile court ultimately adjudicated E.E.S dependent

---

[1] The trial court held its decision as to E.S., the father of E.S.S., in abeyance pending confirmation of his desire to relinquish his parental rights voluntarily. He did not participate in this appeal.  N.T., 12/03/21, at 9-10, 64.

on January 27, 2020, because Mother was leaving the child unattended with Grandmother for long periods. *Id*. at 20-21. Mother's primary issues related to substance abuse and mental health problems. *Id*. at 20-21. The juvenile court ordered, *inter alia*, a full drug and alcohol screen and directed that Mother submit random urine samples.

The initial permanency goal was reunification. Although the juvenile court subsequently found aggravated circumstances against Mother during August 2020, it ordered DHS to continue its efforts toward reunification. *Id*. at Exhibit 4. In order to achieve this objective, DHS developed a single case plan ("SCP") for Mother and fashioned goals relating to (1) drug and alcohol treatment; (2) sobriety; (3) parenting; and (4) consistent visitation with E.E.S. *Id*. at 21. Mother's compliance with the SCP was deficient. *Id*. at 22. She did not consistently attend the court-ordered visitation with E.E.S., failed to complete a parenting course or work reliably with a parenting mentor. *Id*. Similarly, Mother failed to participate in drug and alcohol treatment or demonstrate her sobriety through court-ordered urine screens. *Id*. While Mother was required to attend drug therapy three times per week, she participated sporadically, stopped treatment entirely during July 2021, and reengaged only after DHS commenced the termination proceedings. *Id*. at 22-23. She failed the two original drug screens submitted during winter 2020, and a third on June 17, 2021. *Id*. at 24, DHS Exhibit 5. All three drug tests were positive for PCP. N.T., 12/03/21, at 24, DHS Exhibit 5.

On September 13, 2021, DHS filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). During the ensuing hearing, Mother was represented by counsel and E.E.S. was represented by Suzanne Hodges, Esquire, who acted as legal counsel as well the guardian *ad litem*.[2] DHS presented the testimony of Melissa Urrutia, a case manager for Catholic Community Services CUA #4 and Mother testified on her own behalf.[3] At the close of the evidence, the trial court entered the above-referenced decree terminating Mother's parental rights to E.E.S. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b), and it proffered its rationale from the bench. N.T., 12/3/21, at 64-71.

---

[2] There is no indication in the certified record that the trial court made the required determination as to whether Attorney Hodges could represent both the best interests and legal interest of E.E.S. ***See In re P.G.F***, 247 A.3d 955, 964–65 (Pa. 2021) (holding, "where the orphans' court has appointed a single attorney to serve as guardian *ad litem* and legal counsel to represent both the child's best interests and legal interests, . . . an appellate court should review *sua sponte* whether the court made a determination that those interests did not conflict."). However, since then-two-year-old E.E.S. was too young to communicate a preferred outcome to Attorney Hodges, "there can be no conflict between the child's legal interests and his . . . best interests." ***In re T.S.***,192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (reaffirming ability of attorney-guardian *ad litem* to serve dual role and represent child's best interests and legal interest where preferred outcome is incapable of ascertainment).

[3] Catholic Community Services CUA #4 is a community program that, *inter alia*, performs case management services for DHS. ***See*** https://ccs-cua.org/ While we employ the correct spelling herein, the notes of testimony misspells the CUA caseworker's surname as Urratia.

Mother timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). She presents one question for our review: "Whether the trial court abused its discretion and erred as a matter of law in terminating [M]other's parental rights when DHS failed to meet its burden that termination of parental rights was warranted under 23 Pa.C.S.A. [§] 2511(a) and (b)." Mother's brief at 8. DHS and the child advocate both filed briefs in support of the trial court decree terminating Mother's parental rights.

Our standard of review in termination of parental rights appeals requires us to accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). If the record supports the court's findings, we must determine whether the court committed an error of law or abused its discretion. *Id*. An abuse of discretion does not occur merely because the record could support a different result. *Id*. We may find an abuse of discretion "'only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.'" *Id*. (quoting *In re Adoption of S.P.*, *supra* at 826).

Pennsylvania's Adoption Act governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S. § 2101-2938. It requires a bifurcated analysis in which the trial court focuses first on the parent's conduct pursuant to § 2511(a). *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). If the court determines that the party seeking termination has established statutory

- 4 -

grounds pursuant to § 2511(a), it must then turn its attention to § 2511(b), which focuses on the child's needs and welfare. *Id*. A key aspect of the court's needs and welfare analysis is discerning whether the child has an emotional bond with his or her parent and what effect severing that bond may have on the child. *Id*.; *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006)). The party seeking termination bears the burden of proof under both § 2511(a) and (b) by clear and convincing evidence. *In re C.P.*, *supra* at 520.

Instantly, the trial court terminated Mother's parental rights pursuant to § 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of § 2511(a), in addition to § 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's decision pursuant to § 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To satisfy the requirements of § 2511(a)(2), the party requesting termination must prove that (1) the parent has exhibited repeated and continued incapacity, abuse, neglect, or refusal; (2) the incapacity, abuse, neglect, or refusal has caused the child to be without essential parental care, control, or subsistence; and (3) the parent cannot or will not remedy the causes of the incapacity, abuse, neglect, or refusal. ***In the Interest of D.R.-W.***, 227 A.3d 905, 912 (Pa.Super. 2020). This subsection does not apply solely to affirmative misconduct but also permits termination based on a parent's incapacity. ***In re S.C.***, 247 A.3d 1097, 1104 (Pa.Super. 2021).

In finding that DHS presented clear and convincing evidence to terminate Mother's parental rights to E.E.S. pursuant to the statutory grounds outlined in § 2511(a)(2), the trial court found that Mother exhibited repeated and continued parental incapacity because she was incapable of understanding what was required of her as a parent. The court stated, "[Mother] appears not to be able to grasp what she needs to do to be able to

even reunify with [E.E.S.] let alone parent [E.E.S.]." N.T., 12/3/21, at 66. It highlighted that Mother's limited progress was tied to her work with an intensive case manager, which was described during the hearing as "sort of like a coach" who helps her "keep track of everything, [such as] her appointments" but does not provide any substantive services. *Id*. at 30.

In addition to noting Mother's inconsistent attendance during the supervised visitations, and her failure to complete any of her SCP goals, the court stressed that Mother failed to complete her drug and alcohol treatment or regularly submit urine screens. *Id*. at 67. It found that Mother's participation in drug treatment was inconsistent "throughout the life of this case" and that she only re-engaged treatment two weeks prior to the hearing. *Id*. at 68. Likewise, Mother blamed her inconsistent compliance with drug screen on her inability to provide urine samples due to complications from a gunshot wound in her abdomen. However, the trial court noted that, even after it accommodated Mother by ordering DHS to pay a private laboratory to administer blood tests, she still failed to attend those appointments. *Id*. at 68. Finally, as to Mother's testimony concerning her undocumented achievements, the trial court made a credibility determination in favor of DHS and against Mother, finding that "her testimony clearly, in all points, contradicted the testimony provided by [Ms. Urrutia]." *Id*. at 64-65.

Mother argues that the court erred in concluding that DHS satisfied its burden of proof by clear and convincing evidence because she attended

supervised visitation and made a measure of progress toward her substance abuse treatment. Specifically, Mother asserts:

> She did mental health therapy at Hispanic Community Counseling and did drug and alcohol treatment at the Net. She had a life coach provided by Horizon House and was supported by her [adult] son who lived with her. The case worker said visits [with E.E.S.] went well, Mother and child were bonded and child was doing well in the care of paternal grandmother as Mother had arranged at the beginning of the case. Mother also had housing and income.

Mother's brief at 22 (citations to record omitted).

Ultimately, Mother argues that despite her inconsistent progress in achieving her SCP goals, the record does not support the court's conclusion that E.E.S. was without parental care, and that she could not successfully complete her goals and eventually achieve reunification. *Id*. at 22-23. She reasons,

> Mother was struggling by her own admission since her nephew died in her arms in July, four months before the hearing. She stopped therapy and she entered inpatient mental health treatment, further demonstrating her proactive willingness to improve herself for the sake of her son and reunification. Also, there was no parental capacity evaluation or any express evidence concerning Mother's capacity to parent or refuting her capacity to parent.

*Id*. at 22 (citations to record omitted).

The certified record belies Mother's assertions and supports the trial court's conclusion that Mother cannot remedy the cause of the parental incapacity that led E.E.S. to be without essential parental care. Preliminarily, notwithstanding Mother's protestations concerning a formal parental capacity

evaluation, such evaluations are not required where, as here, the court finds credible testimony supporting that determination. *See In re Adoption of J.J.*, 515 A.2d 883 (Pa. 1986) (upholding trial court's decision to credit testimony of social worker as consistent with the court's fact-finding role).

Furthermore, the certified record establishes that E.E.S. has been in placement since January 27, 2020, having been removed from Mother's custody due to Mother's inadequate parenting and ongoing substance abuse. Mother demonstrated minimal progress toward reunification during the ensuing twenty months. Ms. Urrutia's testimony supported the trial court's findings. She stated that Mother never completed a drug and alcohol program, nor demonstrated that she maintained sobriety. N.T., 12/3/21, at 22. Over the course of her case management, Ms. Urrutia made several efforts to help Mother re-engage with her drug and alcohol treatment programs and instructed Mother to complete the court-ordered drug screens, which were scheduled to occur twice per month. *Id*. at 22-25. While Mother periodically attended approximately one-third of the substance abuse treatment sessions, her appearances were irregular, and she failed to participate in any treatment for approximately five months before re-engaging treatment two weeks before she was scheduled to testify. *Id*. at 23, 59-60.

Concerning the drug screens, Ms. Urrutia explained, "You know, it . . . was an ongoing conversation. Every time that she came for her visits. I would share with her the need for her to complete that screen. Because it relates to

her single case plan objective, we wanted to make sure that she was sober and . . . not using." *Id*. at 25. Likewise, Ms. Urrutia confirmed that the trial court ordered the blood draw at Labcorp to accommodate Mother's physical limitations; however, Mother failed to attend that appointment, again, without explanation. *Id*. at 26-27. Critically, other than the three screens that were positive for PCP, Mother consistently ignored the testing requirements over the twenty months that E.E.S. has been in placement. *Id*. at 24, DHS Exhibit 5.

In addition to her continued struggles with substance abuse Mother, neglected to comply with the other aspects of the SCP that were designed to facilitate reunification. Mother is unemployed and lives with her adult son. *Id*. at 30-31. The home appears appropriate, but Ms. Urrutia prematurely terminated a scheduled home visit because Mother "appeared to be incoherent" and was "unable to answer her questions." *Id*. at 31. Furthermore, while Mother claims to receive SSI because of a preexisting disability, she consistently failed to document that income with DHS. *Id*. at 30, 68. Similarly, Ms. Urrutia testified that Mother never documented any of her asserted progress regarding her parenting goals. *Id*. at 22. Specifically, Mother neglected to engage with her parenting counselor, participate in parenting class, or complete mental health treatment. *Id*. at 28-29.

As it relates to the visitation requirement, Ms. Urrutia testified that Mother's attendance at the weekly, two-hour supervised visitations was

irregular. *Id*. at 32, 33. According to Ms. Urrutia, Mother did not consistently confirm her attendance and, on one occasion, arrived for visitation on the wrong day. *Id*. at 32. The last visitation that Mother attended in-person was on October 27, 2021, which was approximately five weeks prior to the evidentiary hearing. *Id*.

The foregoing evidence concerning Mother's failure to address her substance abuse and parenting deficiencies and inability to commit to visitations with her two-year-old child, establishes that DHS satisfied its burden of proving by clear and convincing evidence the grounds for involuntarily terminating Mother's parental rights pursuant to § 2511(a)(2), *i.e.*, that Mother exhibited continued parental incapacity, which caused E.E.S. to be without essential parental care, control, or subsistence and that she cannot remedy the causes of the incapacity.

We next consider Mother's assertion that the trial court committed an error of law or abuse of discretion in its analysis pursuant to § 2511(b). As explained above, § 2511(b) focuses on the needs and welfare of the child, which includes an analysis of any emotional bond the child may have with his or her parent and the effect severing the bond may have on the child. *L.M.*, *supra* at 511. The key questions are whether the bond is necessary and beneficial and whether severing it will cause the child extreme emotional consequences. *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa.Super. 2018). It is important to recognize that the existence of a bond, while

significant, is only one of many factors courts should consider when addressing § 2511(b). ***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa.Super. 2015). Other factors include "the safety needs of the child, and . . . the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." ***Id***.

> The trial court provided the following needs-and-welfare analysis.
>
> > [Ms. Urrutia's] testimony, again which I find credible, is that [E.E.S.'s] primary parental bond is with his grandmother.
> >
> > [Ms. Urrutia] testified that Mom interacts appropriately with [E.E.S.] and there's no issues, but that is not the same as a parent-child bond.
> >
> > [Ms. Urrutia] also testified that during visits, [E.E.S.] has to be deescalated because he cries a lot when he's not with Grandmother because that's who he's used to. And so this Court will find that **there is no actual mother-child bond between [E.E.S.] and Mom**.

N.T., 12/3/21, at 70-71 (emphasis added).

> In its entirety, Mother's argument is as follows:
>
> > Concerning the issue of maternal bond, as stated previously, the worker testified that there was a bond and visits generally went well. Mother, testified that she would do anything to get her child back and her various efforts at self-improvement demonstrate that she has taken action to preserve the bond that she has with her child. Furthermore, a bonding evaluation had never taken place. As there was enough indication that a bond existed that would be harmful to the child if broken, DHS did not satisfy the requirement of 23 Pa.C.S.A. § 2511([b]), and the Judge's opinion on this topic was not supported by competent evidence.

Mother's brief at 26.

Again, the certified record belies Mother's complaints. First, we reject Mother's suggestion that a bonding evaluation was required. A formal bonding evaluation is unnecessary when the trial court engages in the appropriate lines of inquiry during the needs and welfare analysis. *See In re K.K.R.S.*, 958 A.2d 529, 533 (Pa.Super. 2008) ("In analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert."). Indeed, "[i]t is sufficient for the orphans' court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child." *Interest of L.W.*, 267 A.3d 517, 523 (Pa.Super. 2021).

Next, as to the tenor of Mother's interaction with E.E.S., which is the foundation of Mother's argument in favor of preserving her parental rights, *i.e.*, that visits went well, Ms. Urrutia testified that "[E.E.S.] is a very playful boy. He engages with everybody at the agency. And so it's easy for her to interact with a child like that. It's easy for her to interact with him." N.T., 12/3/21, at 42. More importantly, Ms. Urrutia did not identify a parental bond between Mother and E.E.S. during the supervised visitations and she did not anticipate any negative effects to him upon the severance of that relationship. *Id*. at 39, 43. As to E.E.S.'s post-termination prospects, Ms. Urrutia explained, "He's loved and supported in his current placement with paternal grandmother, [J.S.]. She ensures that all his daily needs are met. He's thriving. And I believe that due to Mother's history and inconsistencies

through the life of the case, I don't think there will be any harm." *Id*. at 39. Hence, the record demonstrates that the primary parental bond is between E.E.S. and Grandmother, whom he refers to as MomMom, and to whom he looks to satisfy all his essential needs when he is hungry, sick, or injured. *Id*. at 40. Grandmother has cared for E.E.S. since birth, either independently or with Mother, and the child reacts negatively when separated from her, typically crying and having to deescalate. *Id*. at 33.

In sum, it was within the discretion of the trial court to weigh E.E.S's partial attachment to Mother against other factors, including Mother's inability to provide E.E.S with the necessary parental care, permanence and stability and the fact that the child is thriving in Grandmother's care. As the certified record supports the trial court's finding that involuntarily terminating Mother's parental rights will serve the developmental, physical, and emotional needs and welfare of E.E.S., the trial court did not err in concluding that DHS satisfied it burden pursuant to 23 Pa.C.S. § 2511(b).

For all the foregoing reasons, we affirm the decree terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Decree affirmed.

P.J.E. Bender joins this Memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2022